**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **ORLANDO BRYANT,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **No. 5:15-CV-196 (CAR)** |
| **CHUCK HAGEL, Secretary,** | : | |
| **United States Department of Defense,** | : | |
| **Defense Logistics Agency,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Presently before the Court is Defendant's Motion for Summary Judgment.

Plaintiff Orlando Bryant contends Defendant terminated him, subjected him to a hostile

work environment, and retaliated against him because of his race, in violation of Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII").

After fully considering the matter, the Court finds Defendant is entitled to judgment as

a matter of law on each of Plaintiff's claims, and thus, Defendant's Motion for Summary

Judgment [Doc. 21] is hereby **GRANTED**.

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

be granted "if the movant shows that there is no genuine dispute as to any material fact

1

and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[4]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[6]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[3] *See id.* at 249-52.
[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[5] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).
[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.
[7] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

# BACKGROUND

Plaintiff, an African American male, contends his Caucasian supervisor targeted him for termination to fulfill his supervisor's stated goal to "lighten up" the workforce since Plaintiff was a probationary employee and thus easy to terminate. To achieve his goal, Plaintiff contends his supervisor engaged with other managers and co-workers to "arrange" Plaintiff's termination. Plaintiff filed this action alleging Defendant unlawfully terminated him based on his race, subjected him to a racially hostile work environment, and contested his unemployment benefits in retaliation for filing an Equal Employment Opportunity ("EEO") complaint.

Defendant denies all allegations and contends it legitimately terminated Plaintiff due to his lack of work ethic and harassment of a co-worker; did not subject him to a racially hostile work environment; and merely exercised its legal right to contest his unemployment benefits. The facts, taken in the light most favorable to Plaintiff as the nonmoving party, are as follows:

From January 18, 2011, until his termination on September 22, 2011, Plaintiff was a civilian probationary employee of the Defense Logistics Agency ("DLA"). Plaintiff was employed as a distribution process worker in the DLA Distribution Center, and his duties included making pallets, driving forklifts, and loading and unloading trucks. When hired, Plaintiff understood he was a probationary employee. Per regulation, the probationary period is the time period that "[t]he agency shall utilize . . . as fully as

possible to determine the fitness of the employee and shall terminate his services during this period if he fails to demonstrate fully his qualifications for continued employment."[8]

Plaintiff worked in the Consolidation and Containerization Point Division ("CCP"). Robert Stewart (Caucasian) was Chief Director of the CCP Division. Under Stewart were two supervisors, Jack Rose and Linette George. Under each supervisor was a work lead who served as the leader of a team of distribution process workers. During the relevant time period, Plaintiff's supervisor was Linette George (African American), and Plaintiff's work leads were Chip Blunt (African American) and C.M. Smith (Caucasian).

On June 30 2011, Plaintiff's supervisor, Linette George, completed a midterm evaluation of Plaintiff.[9] The evaluation was mostly positive, stating that Plaintiff performs all tasks, exhibits a dedicated work ethic, exhibits dependability, and engages in team duties.[10] However, George also documented that Plaintiff "needs to exercise professionalism more often," and while she had "seen improvement in conduct," she encouraged Plaintiff to "keep moving ahead in the right direction."[11]

In August 2011, Stewart, who "made it a habit to walk out of [his] office onto the floor at any given time to see how things were going," observed "more than once"

---

[8] 5 C.F.R. § 315.803(a).
[9] Pl.'s Performance Rating dated June 30, 2011 [Doc. 35-9, pp. 27-28].
[10] *Id.* at p. 27.
[11] *Id.* at p. 28.

Plaintiff and another co-worker Darrell Smith (African American) sitting in chairs.[12] When Plaintiff and D. Smith noticed Stewart watching them, they would "get out of the chair and go get with the rest of the team and work."[13] Stewart spoke with Plaintiff and D. Smith's supervisor, Linette George, about his observations and told George to watch them.[14]

On August 19, Plaintiff met with Stewart and complained that he felt harassed by George, as she was "constantly on [his] back about everything," "looking for [him], and singl[ing] him out" from "everyone" else.[15] Stewart memorialized this meeting in a Memorandum for Record ("MFR") stating the following:

> [Plaintiff] was not very specific when pressed about what Ms. George did that led him to believe she was singling him out, other than the leads had asked what she might have against him.
> I reiterated the need to work as a team and that the supervisors and leads have authority and responsibility for what happens on the floor; that I expected everyone to work together. I also stressed the need for each to respect the other.
>
> I told him I would look into his concerns and get back to him.
>
> NOTE: I have observed [Plaintiff] on the floor and have expressed my concerns that he is not working to the level of our other employees. I often find him either on a forklift or standing to the side engaged in conversation. Until last week (when I pressed Ms. George) I did not usually see [Plaintiff] helping build pallets.

---

[12] Stewart Depo., p. 93 [Doc. 35-8].
[13] *Id.*
[14] *Id.* at p. 94.
[15] Pl. Depo, pp. 31-33.

In addition, I have received a number of complaints that [Plaintiff] does not fully engage with the team in the pallet build process, that when there is a need for help, he is often not where he should be. When speaking to one of the work leads, he commented that he normally has to go find [Plaintiff] once he gives [Plaintiff] a task to do. I have asked the supervisors to stay on top of this issue, which is the reason Ms. George has spent so much attention to [Plaintiff].

As to [Plaintiff's] complaint that Ms. George is "out to get him"; this is untrue and without merit. Ms. George is doing what I expect of a supervisor, when I observe and make note of my concerns on an employee, and [Plaintiff] is not unique in having supervisory attention. [Plaintiff] is a probationary employee and I have my concerns about retaining him beyond his probationary period. I have gotten feedback from team members and from outside of the team that he stirs the pot.

[. . .]

Ms. George is doing exactly what I expect of her, and I have expressed by concerns about the negative impact [Plaintiff] has had on the team and as a probationary employee, he is a candidate for termination under the probationary program. She has paid closer attention to [Plaintiff], trying to given him ample opportunity to prove he should be retained past his probationary period.[16]

Plaintiff states after he complained to Stewart, George removed him from forklift duty and required him to retrieve scrap metal, a strenuous manual labor position.[17]

Eventually, Plaintiff asked Ms. George why she was harassing him, and Plaintiff states George told him it was because she wanted to get a promotion.[18]

Around this same time in August, Stewart learned of animosity between distribution process employee Steve Jackson (African American) and several of his co-

---

[16] Stewart's MFR, dated Aug. 19, 2011 [Doc. 21-1, pp. 29-30].
[17] Pl. Depo., p. 41 [Doc. 23].
[18] *Id.* at p. 31.

workers, including Plaintiff and D. Smith—animosity that, as reported to Stewart, had been steadily progressing since June. Around August 16, 2011, Jackson complained to his supervisor Linette George, and then later to Stewart, that his co-workers, specifically naming Plaintiff and D. Smith, had been harassing him, calling him names, making comments about him in front of co-workers, and calling him a "snitch" for his discussions with management.[19] In the MFR dated August 19, Stewart documented his knowledge at that time of Plaintiff's alleged harassment of Jackson:

> Steve Jackson came to me this morning complaining that [Plaintiff] and other employees were taunting him and picking on him. The supervisors have already spoken to [Plaintiff] and two weeks ago I handed out the depot's Violence in the Workplace Policy letter and stressed the need to be respectful of each other; we do not taunt or pick on other members.[20]

Thus, on August 19, 2011, Stewart held a meeting for all CCP employees regarding the DLA's violence in the workplace policy, which prohibited conduct that created the potential for a hostile environment, which Stewart interpreted to include harassing other employees.[21] Stewart printed off copies of the policy for the employees to take with them.[22] Because so many copies of the policy were left in the room, Stewart held another meeting regarding the policy on August 20th, wherein he stressed there was an absolute zero tolerance for workplace violence.[23]

---

[19] Stewart Depo., pp. 62-63; Jackson Decl., Ex. J-2, [Doc. 21-3, pp. 5-6].
[20] Stewart's MFR, dated Aug. 19, 2011 [Doc. 21-1, pp. 29].
[21] Stewart Depo., p. 26.
[22] Stewart Depo., pp. 63-64.
[23] *Id.* at p. 65.

Despite these two meetings, Jackson relayed to Stewart that Plaintiff and others continued to harass him. On August 22nd, Jackson was on his way to Linette George's office when he states he clearly heard Plaintiff call him a "snitch."[24] The next day, on August 23rd, Jackson complained to his work lead Charlie Blunt "that this crap needs to stop and it needs to stop now[.]"[25] Jackson told Blunt he was "getting sick and tired of [D. Smith] and [Plaintiff] [making] harassing remarks toward [him]," that Blunt "need[ed] to fix this," and that Jackson could "not take it anymore."[26]

In response to Jackson's complaints, a meeting was held on August 23rd between Plaintiff, Jackson, D. Smith, their work leads (Charlie Blunt and C.M. Smith), and their supervisors (Jack Rose and Linette George).[27] Stewart was not present at the meeting, but he was given a written summary of the meeting by Jack Rose and Linette George. The written summary provided that the meeting was held

> to address concerns over employee harassment. [Jackson] expressed to [Blunt] that [D. Smith] and [Plaintiff] were calling him "snitch" and giving him other unwanted conversation. [Jackson] claimed he asked [Plaintiff] to stop messing with him since he was not in a joking mood. [Plaintiff] denied he said anything to [Jackson] and thought [Jackson] was lying about his claim.[28]

The supervisors warned all present that "harassment in the workplace will not be tolerated and received full verbal acknowledgement and commitment from all

---

[24] Jackson Decl., Ex. RS-11 [Doc. 21-2, p. 26].
[25] *Id.*
[26] *Id.*
[27] *Id.*; Pl. Depo, p. 46.
[28] Summary dated August 23, 2011, Ex. RS-14 [Doc. 21-2, p. 32].

employees of the organizational expectations."[29] Plaintiff states he never harassed Jackson, and he certainly did not continue to harass him after the August 23 meeting. However, Jackson told Stewart that the harassment did not cease.

On August 25, 2011, Jackson made a statement to a co-worker that involved bringing a gun to work. Jackson said he stated, "if you keep kicking a dog, he's gonna bite your ass that why people get mad + shoot up the place"[30]; others who witnessed the incident stated Jackson said he was "pushed to limit, I have lost my self respect I'm going to get my pistol and shoot up everything"[31]; and that "he should come in to work with a pistol and shoot this MFer up."[32] Regardless, Jackson's statements were interpreted as a terroristic threat. Jackson was escorted from the property by security and later discharged the same day as Plaintiff.[33]

Robin's Air Force Base Security Forces responded to the terroristic threats incident. Per protocol, the officers took statements from Jackson and four witnesses by Form 1168.

Stewart was home sick on August 25 and was informed by telephone of Jackson's terroristic threats. When Stewart returned on August 26, he began an investigation into the incident to determine what led Jackson to make the terroristic

---

[29] *Id.*
[30] Jackson Decl., Ex. RS-11 [Doc. 21-2, p. 26].
[31] Statement from Thomas James [Doc. 21-2, p. 11].
[32] Statement from Alexander White [Doc. 21-2, p. 16].
[33] Stewart Depo., p. 97. [Doc. 35-8].

threats. Between August 25 and August 29, Stewart retrieved the Form 1168 witness statements taken by Robin's Air Force Base Security Forces, and Stewart received a statement from Jackson detailing the harassment he endured from Plaintiff and D. Smith. Stewart states he also asked Plaintiff and D. Smith to give statements, but they refused; Plaintiff and D. Smith both state Stewart did not ask them for a statement.

On August 29, four days after the terroristic threats incident, Stewart initiated proceedings to terminate Plaintiff and other probationary employees he felt contributed to the incident that took place with Jackson.[34] Stewart sent an email to DLA Human Resources with the following documents attached to determine if those documents provided sufficient documentation for termination: the Form 1168 witness statements taken by Robin's Security Forces; the typed statement from Jackson detailing his harassment and the terroristic threats incident; the summary of the meeting between Plaintiff, Jackson, D. Smith and their supervisors on August 23rd; and Stewart's MFR dated August 19, 2011, wherein Stewart documented his concerns about retaining Plaintiff because "he stirs the pot."[35]

Meanwhile, Stewart continued to investigate the terroristic threats incident. On September 2, an unidentified female employee told Stewart that Plaintiff and D. Smith

---

[34] Email chain dated August 29 and 30, 2011 between Stewart, Baker DLA CIV HUMAN RESOURCES, and Mundis DLA CIV HUMAN RESOURCES, Stewart Decl., Exs. RS-10-14 [Doc. 21-2, pp. 25-33]; *see also* Stewart Decl. [Docs. 35-9, p. 18].
[35] *Id.*

"had been giving her a hard time, picking on her."[36] The female employee, however, was reluctant to provide a written statement. She also told Stewart that when she confronted Plaintiff and D. Smith, they stopped bothering her.[37] Stewart memorialized his conversation with the female employee in an MFR, and he forwarded the MFR to Human Resources by email on September 9th.[38]

On September 7, Stewart spoke with and received a statement from Michael Greene, a co-worker of Plaintiff's, who specifically named Plaintiff and D. Smith as "harassers."[39] Stewart forwarded Greene's statement by email to Human Resources. In the email Stewart wrote:

> I received this today from one of my employees. We spoke and he related to me that after [Plaintiff] and Darrel Smith were counseled about picking on Steve Jackson, that they were upset that a "dude" would complain. From our discussion and Mr. Greene's statement, it appears that these two individuals did not take seriously what there were being told about taunting and picking upon another team mate.[40]

Six days later, on September 13, 2011, Stewart formally requested authority to terminate Plaintiff and D. Smith.[41] In the disciplinary action request form, Stewart

---

[36] MFR dated Sept. 2, 2011, Stewart Decl., Ex. RS-9 [Doc. 21-2, p. 22].

[37] *Id.*

[38] Email from Stewart to Mundis DLA CIV HUMAN RESOURCES dated Sept. 9, 2011, Stewart Decl., Ex. RS-8 [Doc. 21-2, p. 21].

[39] Handwritten statement from M. Greene, Stewart Decl., Ex. RS-6 [Doc. 21-2, p. 19].

[40] Email from Stewart to Mundis DLA CIV HUMAN RESOURCES dated Sept. 7, 2011, Stewart Decl., Ex. RS-5 [Doc. 21-2, p. 18].

[41] CSO-N Pre-Action Interview Checklist and Disciplinary Action Request Form Email from Stewart to Mundis DLA CIV HUMAN RESOURCES dated Sept. 13, 2011, Stewart Decl., Ex. RS-15 [Doc. 21-2, pp. 33-39].

memorialized his belief that "both engaged in harassing and intimidating behavior that violates the DLA violence in the Workplace Policy."[42] Stewart further wrote that he had received complaints about "their lack of effort in their work" and "'drama' created by two of team members" Stewart believed to be Plaintiff and D. Smith.[43] Moreover, Stewart documented that after Plaintiff and D. Smith were counseled about harassment in the meeting on Aug. 23rd, he believed they "did not take the message seriously," as "[t]hey openly mocked the counseling and tossed veiled threats at [Jackson]. The next day Steve Jackson made the comments he made about bringing a gun to work."[44] Because Stewart believed Plaintiff and D. Smith did not take the counseling seriously, he recommended termination because he "believe[d] they [would] not respond positively to other forms of discipline designed to improve behavior."[45]

The disciplinary action request form contains a section for the employee to provide an explanation and sign the form. Plaintiff says Stewart neither asked him for an explanation nor required him to sign the form.

On September 21, Stewart received six responses to the questionnaire Stewart gave to employees as part of his investigation, wherein he asked if they had witnessed any harassment of Jackson or personally experienced any harassment. One employee responded he had witnessed no harassment; three responded they had heard about

---

[42] Disciplinary Action Request Form, Stewart Decl., Ex. RS-15 [Doc. 21-2, p. 37].
[43] *Id.*
[44] *Id.*
[45] *Id.*

Jackson's harassment, but did not personally witness any harassment; one responded he had witnessed an employee making statements about Jackson, but not directly to Jackson; and a female employee stated she had personally experienced harassment by Plaintiff and D. Smith.[46]

Also on September 21, Stewart received a follow-up statement from M. Greene wherein he stated he "had not personally witnessed either Darrell Smith or [Plaintiff] harass or make harassing comments directly to Steve Jackson."[47] Greene clarified that he "never heard either D. Smith or [Plaintiff] call S. Jackson a snitch! [He] heard only what other people on the floor say what they heard concerning the situations, just gossip!"[48]

On September 22, 2011, Stewart terminated Plaintiff. Plaintiff's termination letter stated:

> This action is being affected because you have been disruptive and created conflict within the workplace by taunting and spreading stories about co-workers. Additionally, I personally observed you loafing and not performing your duties. Floor supervisors, Jack Rose and Linette George met with you on August 23, 2011, in order to address complaints received from the work force regarding your behavior and lack of production. After the counseling, a witness informed me you openly mocked it, which leads me to believe that you did not take it seriously.
>
> These incidents together indicate a non-productive and antagonistic attitude, which has ruined the morale of this workforce; therefore, this type of behavior will not be tolerated. Your behavior has caused your co-workers to feel intimidated and harassed. In accordance with DLA Instruction 7213, dated September 24, 2009, it is DLA's policy to promote a

---

[46] Questionnaire Responses, Stewart Decl., Ex. RS-16 [Doc. 21-2, pp. 40-45].
[47] M. Greene's continuance of previous statement, Stewart Decl., Ex. RS-7 [Doc. 21-2, p. 20].
[48] Id.

safe environment for its employees, from violence, threats of violence, harassment, intimidation and other disruptive behavior; therefore, all reports of such incidents will be taken seriously. This Agency is entitled to expect all employees to conduct themselves in accordance with acceptable standards. Since you have failed to do so, it is my decision that you should be terminated during your probationary period.[49]

Following Plaintiff's termination, Defendant received two letters from Plaintiff's work leads, Charlie Blunt and C.M. Smith, supporting Plaintiff and contesting his termination. On September 23, Blunt wrote a letter stating that he believed Plaintiff "ha[d] been unjustly terminated."[50] He further stated that "[w]hile working under [Blunt's] supervision [Plaintiff's] work had been above and beyond reproach. Whenever called upon to work over, [Plaintiff] ha[d] always be[en] available and always performed his duties immaculately."[51]

On October 5, C.M. Smith wrote a letter stating Plaintiff "performed his work with diligence," and he "repeatedly witnessed [Plaintiff's] professionalism in his attitude, appearance, and outstanding job performance."[52] Moreover, Smith expressed his beliefs that Jackson could not be trusted, that Plaintiff's termination was a "grave injustice," and he felt "this was an arranged termination taken by some of the CCP's

---

[49] Termination Letter, Stewart Decl., Ex. RS-17 [Doc. 21-22, p. 46].
[50] Letter from C. Blunt dated Sept. 23, 2011, Stewart Depo., Ex. 17 [Doc. 35-9, p. 29].
[51] *Id.*
[52] Letter from C.M. Smith dated Oct. 5, 2011, Stewart Dep., Ex. 15 [Doc. 35-9, p. 24].

management team to accommodate their personal and not professional choices at an opportune time."[53]

Plaintiff believes Stewart targeted him and D. Smith for termination based on their race. Plaintiff states Stewart demonstrated racial animosity towards African American employees in the CCP Division. Stewart would "often" comment that the DLA's workforce was "too dark" or "too black," in need of being "lightened up," and that Stewart intended to "change the color around here."[54] Two of Plaintiff's co-workers, Darrell Smith and Jesse French (African American), also stated Stewart "frequently" mentioned the work environment was "too dark" and in need of "lightening up."[55]

Plaintiff recounted a time when Stewart instructed him and several of his African American co-workers to turn off the music they were listening to by an African American rap artist because Stewart "didn't want to hear none of that Snoop Dogg shit"; however, Stewart allowed some Caucasian employees to continue listening to their music.[56] D. Smith and French also recalled this incident, and French states Stewart referred to the music as "jungle music."[57]

---

[53] *Id.*
[54] Pl.'s Decl., ¶ 5 [Doc. 35-2].
[55] French Decl., ¶5 [Doc. 35-6]; D. Smith's Decl., ¶ 5 [Doc. 35-5].
[56] Pl. Decl., ¶ 6 [Doc. 35-2].
[57] French Decl., ¶6 [Doc. 35-6].

Several of Plaintiff's co-workers identified other alleged racial incidents with Stewart. D. Smith stated Stewart commented he heard Stewart say there were "too many monkeys" comprising the work force, and he knew Stewart refused to put up a picture of President Obama where there had previously been one of Georgia W. Bush.[58] D. Smith recounted a time when he and another co-worker picked up Stewart for work one morning, and Stewart refused to sit in the backseat, instead commanding Smith to sit in the back "where [he] belong[ed]."[59]

French stated Stewart was "particularly demeaning" in how he addressed French and other African American employees in comparison to their "Caucasian counterparts."[60] Plaintiff's work lead C.M. Smith said that Stewart would treat Plaintiff, D. Smith, and French with negative actions and feedback; speak to them in a condescending and demeaning tone; and delegate to them more difficult and physically-strenuous tasks as opposed to Caucasian employees.[61] Stewart would even ask Smith to write up Plaintiff, but Smith did not because he believed Plaintiff had done nothing wrong.[62]

After Plaintiff's termination, he filed a complaint with the EEO alleging racial discrimination. Thereafter, Plaintiff filed for unemployment benefits with the State of

---

[58] D. Smith Decl., ¶ 5 [Doc. 35-5].
[59] *Id.*
[60] French Decl., ¶ 6 [Doc. 35-6].
[61] C.M. Smith Decl., ¶ 6 [Doc. 35-7].
[62] *Id.* at ¶ 7.

Georgia, which Defendant contested. Plaintiff did not receive any benefits. After receiving his right to sue letter from the EEO, Plaintiff filed this action alleging Defendant terminated him based on his race, subjected him to a racially hostile work environment, and contested his unemployment benefits in retaliation for Plaintiff filing an EEO Complaint. Defendant has now moved for summary judgment on each of Plaintiff's claims.

## DISCUSSION

Plaintiff's claims against Defendant are based on alleged violations of Title VII. Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[63] When a plaintiff, like the one here, offers circumstantial evidence to prove a Title VII claim, the claim is evaluated under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*.[64]  First, the plaintiff must establish a *prima facie* case, or "facts adequate to permit an inference of discrimination."[65]  If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for

---

[63] 42 U.S.C. § 2000e-2(a)(1).
[64] 411 U.S. 792 (1973).
[65] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

the challenged adverse employment action.[66]  If the employer meets this burden, the plaintiff then has an opportunity to show that the employer's proffered reasons for the adverse employment action were merely pretext for discrimination.[67]

## I.   Discriminatory Termination

Plaintiff contends Defendant unlawfully terminated him because of his race. Defendant, however, maintains race had nothing to do with Plaintiff's termination, as Stewart legitimately terminated Plaintiff, a probationary employee, based on his disruptive and harassing behavior in the workplace that created conflict amongst his co-workers, his harassment of Jackson, Stewart's observations of Plaintiff "loafing" on the job, and Stewart's belief that Plaintiff did not take the warnings of his behavior seriously.

### A.  Prima Facie Case

To establish a *prima facie* case of discriminatory termination, Plaintiff must show he (1) is a member of a protected class;  (2) suffered an adverse employment action; and (3) was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class.[68]  Plaintiff clearly meets the first two elements. Because the record contains evidence that after Plaintiff, Jackson,

---

[66] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).
[67] *Id.* at 253.
[68] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

and D. Smith were discharged[69] they were replaced by two Caucasian men,[70] the Court finds Plaintiff meets his prima facie case of discriminatory termination.[71] Therefore, the burden now shifts to Defendants to articulate a legitimate, nondiscriminatory reason for terminating him.

### B. *Legitimate Nondiscriminatory Reasons*

The burden on Defendant for providing legitimate nondiscriminatory reasons for Plaintiff's termination is one of production, not persuasion, and Defendant needs only produce credible evidence supporting the decision.[72] Here, Defendant gives two reasons for Plaintiff's termination: 1) he had poor work ethic, and 2) he was "disruptive and created conflict within the work place by taunting and spreading stories about co-workers."[73] These are certainly reasons "that might motivate a reasonable employer."[74] Thus, Defendant has met its "exceedingly light" burden of producing a legitimate non-

---

[69] D. Smith was terminated a few days after Plaintiff because he was not present at the workplace on Sept. 22nd. Stewart Depo., p. 97.

[70] *See* Stewart Depo., p. 97; French Decl., ¶ 5 [Doc. 35-6].

[71] Defendant objects to the admissibility of the identity of the two Caucasian men French identifies in his Declaration. On summary judgment the Court can consider evidence that can be reduced to admissible form at trial. *Roswell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). Defendant makes no objection that this evidence cannot be reduced to admissible form at trial. Thus, the Court will consider it.

[72] *Chapman*, 229 F.3d at 1024 ("However, the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." (internal quotation marks omitted)).

[73] Termination Letter, Stewart Depo., Ex. 9 [Doc. 35-9, p. 16].

[74] *Chapman*, 229 F.3d at 1030.

discriminatory reason for Plaintiff's termination, and the burden now shifts to the Plaintiff to establish these reasons are merely pretext for race discrimination.[75]

## C. *Pretext*

To establish pretext, a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision.... [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."[76] "[I]f the employer proffers more than one legitimate nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."[77] "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... evidence of legitimate, non-discriminatory reasons for its actions."[78] Evidence establishing pretext may include the same evidence initially offered to establish the *prima facie* case of discrimination.[79]

---

[75] *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769-770 (11th Cir. 2005).

[76] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks and citation omitted).

[77] *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

[78] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (internal quotation marks and citation omitted).

[79] *Wilson v. B.E. Aerospace*, 376 F.3d 1079, 1088 (11th Cir.2004).

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer."[80] The pretext inquiry centers around the employer's beliefs, and Plaintiff must show more than the proffered reasons were ill-founded.[81] Specifically, if "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason."[82]

Plaintiff attempts to demonstrate pretext by showing Defendant's reasons for Plaintiff's termination are unworthy of credence. Plaintiff theorizes that Stewart "targeted" Plaintiff and D. Smith for termination to fulfill his goal of "lightening up" the workforce since they were probationary employees and thus easy to terminate. Plaintiff contends his termination "was arranged" by management.

Plaintiff argues a reasonable jury could believe his theory because (1) no evidence exists showing Plaintiff exhibited poor work ethic or poor performance, and (2) a reasonable jury could find Stewart conducted a biased investigation into Jackson's terroristic threats with the intent to implicate Plaintiff. The Court disagrees. As set forth below, Plaintiff's arguments are ultimately based on personal beliefs and opinions,

---

[80] *Chapman*, 229 F.3d at 1030.

[81] *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

[82] *Chapman*, 229 F.3d at 1030; *see also Nix v. WLCY Radio/Rehall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

speculation, and mere disagreement with Stewart's decision. Plaintiff fails to rebut Stewart's legitimate, non-discriminatory reasons for terminating Plaintiff.

Plaintiff first argues Stewart's "lack of work ethic" reason for terminating Plaintiff is unworthy of credence because (1) Plaintiff's employment record lacks any complaints, write-ups, and disciplinary actions; and (2) statements from Plaintiff's team leads and co-workers praising Plaintiff's work performance and work ethics, and describing Stewart's perceived favoritism toward "selective Caucasian counterparts" establish Plaintiff exhibited superb work ethic.[83] Plaintiff's arguments, however, are insufficient to create any issue of material fact regarding pretext. First, Plaintiff's midterm feedback at the end of June clearly identified issues with Plaintiff's professionalism and conduct that his supervisor Linette George instructed him to improve upon. George specifically wrote that Plaintiff "needs to exercise professionalism more often," and while she had "seen improvement in conduct," she instructed Plaintiff to "keep moving ahead in the right direction."[84]

Second, even assuming the admissibility of all of the statements submitted by Plaintiff's co-workers and work leads, they are simply personal beliefs and opinions. They do not rebut or contradict <u>Stewart's</u> belief that Plaintiff exhibited a poor work ethic. Stewart personally observed Plaintiff sitting in chairs not working. Moreover, Stewart documented that he had received "a number of complaints that [Plaintiff] does

---

[83] C.M. Smith Decl., ¶ 6 [Doc. 35-7].
[84] Pl.'s Midterm Feedback dated June 30, 2011 [Doc. 35-9, pp. 27-28].

not fully engage with the team in the pallet build process, that when there is a need for help, he is often not where he should be."[85] Stewart spoke to "one of the work leads, [and] he commended that he normally has to go find [Plaintiff] once he gives [Plaintiff] a task to do."[86] The fact these co-workers did not see Plaintiff loafing does not mean Stewart did not observe Plaintiff loafing.

Plaintiff next attempts to prove pretext arguing Stewart conducted a biased investigation surrounding the events of Jackson's threats with the intent to implicate Plaintiff. Plaintiff bases this argument on the following: (1) Stewart did not follow DLA investigation and termination policies; (2) Stewart sought Plaintiff's termination less than four days after Jackson's terroristic threats; (3) Stewart provided false documents to human resources to support Plaintiff's termination; and (4) Stewart deliberately failed to consider information exonerating Plaintiff and deliberately misrepresented documents to human resources.

Plaintiff's arguments, however, are neither supported by the record nor sufficient to rebut Stewart's legitimate reasons for terminating Plaintiff due to his lack of work ethic and harassment of a fellow employee. As to the first argument, although failure to follow work policies can be evidence of pretext, the record contains no DLA policies or regulations on Defendant's investigation or termination procedures. Thus, although Plaintiff and Stewart disagree as to whether Stewart asked Plaintiff to provide a

---

[85] MFR dated August 19 [Doc. 21-1, pp. 29-30].
[86] *Id.*

statement during his investigation of Jackson's terroristic threats, no evidence exists showing Stewart was <u>required</u> to obtain a pre-termination interview of a probationary employee. Therefore, the dispute of fact about whether Stewart obtained a statement from Plaintiff is immaterial.

As to the second argument, no credible evidence supports Plaintiff's theory that Stewart "targeted" Plaintiff for termination on August 19—six days prior to the terroristic threats incident—and then used the investigation into Jackson's terroristic threats merely as a means to tie Plaintiff to the terroristic threats incident to justify termination. On the contrary, the record reflects Stewart's documented concerns about Plaintiff's abilities to continue working and his decision-making process to terminate Plaintiff. In the August 19 MFR, Stewart documented his initial concerns "about retaining [Plaintiff] beyond his probationary period."[87] Stewart continued that he had "gotten feedback from team members and from outside of the team that [Plaintiff] stirs the pot" and merely concluded that "Plaintiff is a candidate for termination under the probationary program."[88] Stewart did not terminate Plaintiff until September 22, 2011.

In addition, that Stewart first sought Plaintiff's termination on August 29—only four days after the terroristic threats incident occurred—creates no triable issue on Plaintiff's theory that Stewart used the investigation merely to terminate Plaintiff

---

[87] MFR dated August 19, 2011 [Doc. 21-1, pp. 29-30].
[88] *Id.*

because of his race. By August 29, Stewart had observed Plaintiff "loafing,"[89] documented complaints regarding Plaintiff's work ethic,[90] received a complaint from Jackson that Plaintiff had been harassing him,[91] received a summary from Plaintiff's work leads over the meeting with Plaintiff wherein they had to address "concerns over employee harassment,"[92] and received a statement from Jackson detailing the harassment.[93] No evidence contradicts or rebuts Stewart's belief Plaintiff had been part of the reason Jackson made the terroristic threats.

Plaintiff's third argument—that Stewart knowingly provided human resources with a falsified Form 1168 from Jackson to support Plaintiff's termination—is speculative and insufficient to show pretext. As part of this litigation, Sergeant Bostic, one of the security officers that responded to the terroristic threats incident, reviewed the Form 1168 statements taken by security and opines "that the Form 1168 completed by Steve Jackson is not the original or that the original has been tampered with."[94] Bostic points out that in comparison to the other witness statements, Jackson's 1168 Form does not have initialing by the Xs, the handwriting is cramped as it nears its conclusion, the statement strays outside the form's parameters, there is an absence of the declarant's signature, there is no written "//END OF STATEMENT//" at the end to

---

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] Summary dated August 23, 2011, Ex. RS-14 [Doc. 21-2, p. 32].

[93] Jackson statement dated August 25, 2011, Stewart Decl., Ex. RS-11 [Doc. 21-2, pp. 25-28].

[94] Bostick Decl., ¶ 6 [Doc. 35-3].

ensure nothing is later added, and the Acknowledgement of Offenses is not crossed out.[95] Bostic continues to state that "it is relatively easy to tamper with these forms, as they are available for download from the internet, and it is a simple task to white out the form's content, either manually or by canning it and erasing the text electronically."[96] Finally, Bostic states that "[t]hese statements are reviewed by the Patrol man, and the on-duty flight chief, and the Law enforcement desk, and this statement would have been halted at any of those tiers because of the aforementioned issues[.]"[97]

Even assuming Sergeant Bostic's opinions are admissible, no evidence shows Stewart <u>knew</u> Jackson's Form 1168 statement was falsified when he provided it to human resources. Bostic's testimony simply indicates that Jackson's Form 1168 appeared irregular, that the forms are easy to tamper with, and that Jackson's form did not appear to have been processed in accordance with standard procedures. No evidence exists that Stewart had any familiarity or experience with the Form 1168 in general such that he would have known the document was false and presented it to human resources anyway.

Plaintiff's remaining arguments that Stewart failed to consider documents and information exonerating Plaintiff from any involvement with the terroristic threats

---

[95] *Id.*
[96] *Id.* at ¶ 8.
[97] *Id.* at ¶ 9.

incident also fail to show pretext. Plaintiff argues that disciplinary request form Stewart submitted to terminate Plaintiff was fraudulent because Stewart did not obtain a statement from Plaintiff. However, as stated earlier, no evidence exists Stewart was required to obtain a statement from Plaintiff. Plaintiff also contends Stewart did not provide human resources with "exonerating" documents, pointing to M. Greene's September 21 follow-up statement that he did not personally witness Plaintiff make any harassing comments directly to Jackson.[98] However, Greene's statement does not contradict his earlier statement naming Plaintiff as a "harasser" or <u>Stewart's</u> belief that Plaintiff was part of the harassment.

Finally, Plaintiff cannot establish any discrimination based on the "mosaic" theory articulated in *Smith v. Lockheed-Martin Corporation*.[99] In *Lockheed-Martin*, the Eleventh Circuit reiterated that "establishing the elements of the *McDonnell Douglas* framework is not, and was never intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."[100] Rather, the court noted that a plaintiff may present a triable issue if she establishes "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."[101]

---

[98] M. Greene's continuance of previous statement, Stewart Decl., Ex. RS-7 [Doc. 21-2, p. 20].
[99] 644 F.3d 1321 (11th Cir. 2011).
[100] *Id.* at 1328.
[101] *Id.*

Plaintiff has failed to establish any convincing "mosaic" from which a reasonable jury could determine Stewart terminated Plaintiff because of his race. Plaintiff's theories that Stewart targeted probationary employees like Plaintiff for easy termination to facilitate his goal to "lighten up" his workforce, and fraudulently conducted the terroristic threats investigation to tie Plaintiff to Jackson's harassment are simply that – theories based on personal beliefs and opinions, conjecture, and speculation that amount to mere disagreement with Defendant's decision.

This Court does not sit as a "super-personnel department," and it does not review the wisdom of an employer's business decisions.[102] Ultimately, Plaintiff does not point out any real "weaknesses, implausibilities, inconsistencies, or contradictions" showing Defendant's legitimate non-discriminatory reasons are pretext for race discrimination. Therefore, based on the evidence presented, Plaintiff has failed to show there was a genuine issue of material fact as to whether Defendant's reasons for Plaintiff's termination were pretextual.[103] Because Plaintiff has failed to establish his claim of race discrimination, Defendant is entitled to judgment as a matter of law on this claim.

## II.  <u>Retaliation</u>

---

[102] *See Alvarez*, 610 F.3d at 1266-67 (the "question is whether her employers were dissatisfied with her for [ ] non-discriminatory reasons, even if mistakenly or unfairly so").

[103] *See Jackson*, 405 F.3d at 1291 (granting summary judgment for the employer because plaintiff failed to point "to evidence that created a genuine issue that the reasons that the Board gave were false or that a discriminatory reason was more likely the cause of his termination.")

Plaintiff also alleges Defendant contested his unemployment benefits in retaliation for Plaintiff filing his EEO complaint. In addition, for the first time in his response brief to Defendant's Motion for Summary Judgment, Plaintiff contends Defendant re-assigned him from a forklift position to a manual labor position retrieving scrap metal in retaliation for Plaintiff's complaint to Stewart that his supervisor, Linette George, was harassing him.

Title VII makes it illegal for "an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[104] Retaliation claims follow the same *McDonnell Douglas* burden-shifting framework outlined above.[105]   However, in order to establish a claim of retaliation under Title VII, a plaintiff must prove (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there is a causal relation between the two events.[106]

---

[104] 42 U.S.C. § 2000e–3(a).

[105] 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). Although Plaintiff separately brings her retaliatory termination claims under Title VII and Section 1981, as noted above, the Court's analysis of claims under these statutes is the same.

[106] *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

Moreover, it is up to the employee to prove that "the desire to retaliate was the but-for cause of the challenged employment action."[107] "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[108] As explained below, Plaintiff cannot sustain his retaliation claims.

A. *Plaintiff's Reassignment from Forklift Position*

Plaintiff cannot sustain his new claim Defendant retaliated against him by re-assigning him from his forklift position to a manual labor position retrieving scrap metal. In his Complaint, Plaintiff asserted only one retaliation claim for "the actions of the Agency relating to Plaintiff's termination and opposing his employment evidence retaliation in violation of Title VII."[109] Moreover, in both his deposition and statement of material facts, Plaintiff reiterated that his retaliation claim related solely to Defendant's opposition to the unemployment benefits.[110] Plaintiff is barred from raising new claims in a response brief, and his deadline for amending his complaint has long since passed.[111]

B. *Defendant's Opposition to Unemployment Benefits*

---

[107] *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —U.S.—, 133 S. Ct. 2517, 2528, 186 L.Ed.2d 503 (2013)).
[108] *Nassar*, 133 S.Ct. at 2528.
[109] Pl.'s Amended Complaint, Count III, ¶ 28 [Doc. 6].
[110] Pl. Depo., pp. 21 and 81[Doc. 35-8]; Pl.'s Statement of Material Facts, ¶ 48 [Doc. 35-1].
[111] *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015).

Plaintiff's claim that Defendant retaliated against him by opposing his unemployment benefits also fails. Even assuming Defendant's opposition to his unemployment benefits constitutes an actionable adverse employment action, Plaintiff fails to establish any retaliation was the "but-for" cause of the denial of his benefits. Plaintiff contends a genuine issue of material fact exists as to whether Defendant retaliated against him because Darrell Smith, who was fired for the same reasons as Plaintiff, filed his EEO complaint after seeking unemployment benefits, and Defendant did not contest Smith's unemployment benefits. Such conclusory evidence, however, is insufficient to sustain this claim. The record does not contain all of the reasons why D. Smith was terminated. Thus, Plaintiff's fails to show Defendant's opposition to his unemployment benefits was anything other than an exercise of its legal rights and duties under Georgia law.

## III.    Hostile Work Environment

Finally, Plaintiff asserts he was subjected to racial harassment from Stewart, creating a hostile work environment.  A hostile work environment claim is "established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[112]

---

[112] *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (international quotation marks omitted) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

For Plaintiff to recover on his hostile work environment claim, he must prove: (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminative and abusive working environment; and (5) a basis for holding the employer liable under either a theory of vicarious or direct liability.[113]  Here, like most hostile work environment claims, Defendant argues that even if the Court accepts all of Plaintiff's evidence as admissible, Plaintiff is unable to prove the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment.  The Court agrees.

The severe or pervasive element of the hostile-work-environment claim contains both a subjective and objective analysis.  To satisfy these requirements, Plaintiff must produce evidence from which a reasonable juror could conclude (1) Plaintiff subjectively perceived his work environment to be hostile or abusive and (2) a reasonable person would find the work environment hostile or abusive.[114]  Because Defendant does not dispute that Plaintiff subjectively perceived a hostile work environment, the Court will focus on the objective analysis.

In evaluating whether a reasonable person would find the work environment hostile or abusive, the Court considers the following factors: "(1) the frequency of the

---

[113] *Id.*
[114] *Miller*, 277 F.3d at 1276.

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."[115] The Court must examine the alleged conduct collectively, "not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive."[116] Though there is no "magic number" of comments or behavior that must be done to create a hostile work environment,[117] mere offhanded comments and "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[118]

Considering this evidence in a light most favorable to Plaintiff and assuming all of Plaintiff's proffered evidence is admissible, the Court concludes Plaintiff cannot establish a *prima facie* case of hostile work environment based on his race.

Plaintiff presents the following facts as evidence that "Stewart oversaw a campaign to make [Plaintiff's] work environment so harassing and abusive that the terms and conditions of his employment were altered:"[119] (1) Stewart's request that Plaintiff's supervisor Linette George pay close attention to him; (2) his testimony that Stewart and George deliberately gave Plaintiff conflicting directions while he was at

---

[115] *Id.*

[116] *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).

[117] *Miller*, 277 F.3d at 1269.

[118] *Faragher v. City of Boca Raton*, 524 U.S. 775, 2283 (1998) (internal quotation marks omitted).

[119] Pl.'s brief in response to Defendant's Motion for Summary Judgment, p. 18 [Doc. 35].

work with the intention to make it appear Plaintiff was not on the worksite; (3) Plaintiff's removal from his position as a forklift operator to a manual labor position retrieving scrap metal; (4) Stewart requiring Plaintiff and other African American employees to stop playing music he called that "Snoop Dogg shit" and "jungle music"; (5) observations from co-employees that Stewart treated Plaintiff with constant negative feedback and addressed Plaintiff with a condescending and demeaning tone; and (6) statements from Stewart that the workplace was "too dark" and he wanted to "lighten up" the workforce.

Even if the Court assumes all of Plaintiff's evidence is admissible, it does not rise to a level of frequent or severe necessary to support a showing of a hostile work environment. First, other than his own perception Stewart was targeting him because of his race, no evidence supports a finding that Stewart's conduct identified in Plaintiff's first three facts -- (1) Stewart's request that Plaintiff's supervisor Linette George pay close attention to Plaintiff; (2) Stewart and George deliberately giving Plaintiff conflicting directions while he was at work with the intention to make it appear Plaintiff was not on the worksite; and (3) Plaintiff's removal from his position as a forklift operator to a manual labor position retrieving scrap metal – was racially

motivated. Therefore, Plaintiff cannot rely on these incidents in support of his hostile-work-environment claim.[120]

Thus, what remains of Plaintiff's hostile work environment claim is based on Stewart's alleged racially-charged comments. To sustain a hostile work environment claim based on racial comments, the offensive conduct "must be so 'commonplace, overt and denigrating that [it] created an atmosphere charged with racial hostility.'"[121] Stewart's conduct fails to meet this standard.

Plaintiff personally experienced three incidents of racial hostility. First, Plaintiff states he "often" heard Stewart comment that the DLA's workforce was "too dark," or "too black," in need of being "lightened up," and Stewart intended to "change the color around here."[122] When asked to specify how many times he heard Stewart say these comments, Plaintiff stated "at least twice."[123] Second, Plaintiff states Stewart instructed Plaintiff and his African American co-workers to turn off their rap music because he "didn't want to hear none of that Snoop Dogg shit," but Stewart allowed Caucasian employees to continue listening to their music.[124] Third, evidence supports a finding

---

[120] *See Jones v. UPS Ground Freight,* 683 F.3d 1283, 1297 (11th Cir. 2012) (only conduct that is based on a protected category, such as race, may be considered in a hostile-work-environment analysis).

[121] *Hudson v. Norfolk Southern Ry. Co.,* 209 F.Supp.2d 1301, 1325 (N.D. Ga. 2001) (quoting *EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 (11th Cir. 1990)).

[122] Pl.'s Decl., ¶ 5 [Doc. 35-2].

[123] Pl. Depo., p. 55 [Doc. 23].

[124] Pl.'s Decl., ¶ 6 [Doc. 23].

Stewart addressed Plaintiff and other African American employees in a condescending and demeaning tone that Stewart did not use to address his Caucasian employees.[125]

Plaintiff also submits evidence of racial hostility experienced by some of his co-workers. D. Smith testified he heard Stewart comment there were "too many monkeys" comprising his workforce; he knew Stewart refused to put up a picture of President Obama; and he experienced a time when Stewart instructed D. Smith to sit in the backseat of a car "where [Smith] belong[ed]."[126] J. French testified he heard Stewart refer to the Snoop Dogg music as "jungle music."[127] However, no evidence indicates Plaintiff knew of these incidents. In order for conduct learned through hearsay to support a hostile work environment claim, Plaintiff must have been "aware of the harassing incidents at the relevant time."[128] The Eleventh Circuit has held that "a plaintiff's workplace circumstances do not include other employee's experiences of which the plaintiff is unaware."[129] Here, no evidence indicates Plaintiff knew of his co-workers' experiences until after he was terminated. Thus, Plaintiff cannot now rely on their experiences, which he was unaware of, to create a hostile work environment.

Although the Court condemns the use of Stewart's alleged racially-charged remarks, taking the evidence in its entirety, it cannot conclude the incidents experienced

---

[125] C.M. Smith Decl., ¶ 6 [Doc. 35-7].
[126] D. Smith Decl., ¶ 5 [Doc. 35-5].
[127] French Decl., ¶ 5 [Doc. 35-6].
[128] *Hudson*, 209 F.Supp.2d at 1326-27 (*citing Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1522 (11th Cir. 1995)).
[129] *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014)

by Plaintiff could lead a reasonable jury to conclude he suffered the type of severe and pervasive sustained harassment that rises to the level of a hostile work environment under Eleventh Circuit precedent.[130] No evidence indicates Plaintiff heard any racial slurs or epithets; saw any racist symbols or graffiti; encountered any racially insensitive jokes; was subjected to an overall threatening or humiliating work environment based on his race; or that Stewart's conduct was so repeated and escalated as to be the "centerpiece" of his claim.[131] Plaintiff has also failed to show how his work environment

---

[130] *See Adams* 754 F.3d at 1251-54 (11th Cir. 2014) (finding that a reasonable jury could conclude the conduct was severe or pervasive when Plaintiffs were subject to several offensive racial slurs and experienced some type of harassing conduct "every morning, "every day," "regularly," or "all the time"); *Jones*, 683 F.3d at 1299-1302 (finding a genuine issue of material fact where plaintiff was subjected to seven incidents of racial harassment – one racial remark from a supervisor, four incidents of bananas found on his truck followed by coworkers wearing shirts or hats bearing the confederate flag, and an intimidating confrontation with a coworker); *Guthrie v. Waffle House, Inc.*, 460 Fed. App'x 803, 803, 807-808 (11th Cir. 2012) (finding that a few dozen offensive comments or actions, including sexual comments and being grabbed in the rear, spread over an eleven month time frame, though rude and boorish, fell short of severe and pervasive harassment); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812 (11th Cir. 2010) (concluding there was a genuine issue of material fact when the sexually offensive remarks and conduct occurred "every single day," and was ignored over her repeated complaints); *Miller*, 277 F.3d at 1276 (holding that explicit racial name calling, which occurred three to four times a day for a month, met the frequency requirement); *see also Forson v. Columbia Farms Feed Mill*, 34 F.Supp.3d 1302, 1305-1307 (M.D. Ga. 2014) (granting summary judgment for the employer because the twelve incidents of harassing remarks, 9 of which were racial, were more analogous to the *Adams'* Plaintiffs that did not meet the "severe or pervasive" requirement for hostile work environment).

[131] *See Adams*, 854 F. 3d at 1251-55 (describing the conduct as sufficiently threatening and humiliating harassment when Plaintiffs found a noose in the breakroom, saw racially offensive graffiti multiple times in the bathroom, and was subjected to the daily presence of Confederate flags on coworkers apparel); *Jones*, 683 F.3d at 1304 ("It is this escalation of incidents, with a possibly threatening confrontation as its centerpiece, that makes the issue of racial harassment … one for the trier of fact. Consequently, we believe that the increasing frequency and seriousness of the harassment experienced by [Plaintiff] presents a jury question on the issue of whether he endured a hostile work environment.").

or discriminatory conduct had an unreasonably adverse effect on his job performance. Thus, based on the evidence presented, no genuine issue of material fact exists with respect to Plaintiff's hostile work environment claim.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 22].

**SO ORDERED,** this 29th day of September, 2017.

<u>S/ C. Ashley Royal</u>
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT